NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

Filed / Docketed
April 1, 2008

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CALLAHAN, RUSSELL LYNN and | ) | Case No. 07-10070-R |
| CALLAHAN, BONNIE LEE, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| PATRICK J. MALLOY III, | ) | |
| TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 07-1021-R |
| | ) | |
| DANNY L. BRAZEAL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Before the Court is the Complaint of Plaintiff Patrick J. Malloy III, the Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of Debtors Russell Lynn Callahan ("Mr. Callahan") and Bonnie Lee Callahan ("Mrs. Callahan") (collectively, the "Debtors"), seeking to avoid an alleged preferential transfer of estate property to Defendant Danny L. Brazeal ("Mr. Brazeal") pursuant to 11 U.S.C. § 547(b). The Court held a trial on the merits of the Complaint on February 26, 2008.

Upon consideration of the pleadings, stipulations contained in the Pre-Trial Order entered in this proceeding, trial testimony of witnesses, documents admitted into evidence,

briefs and arguments of counsel, and applicable law, the Court finds and concludes as follows:

## I.     Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(F); and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.    Contentions of the parties

The Trustee contends that by virtue of Mr. Brazeal's repossession of inventory from the Debtors within ninety days of the date the Debtors filed their Chapter 7 bankruptcy petition, Mr. Brazeal received an avoidable preferential transfer of property of the Debtors, the value of which the Trustee seeks to recover for the benefit of the estate.  See 11 U.S.C. § 547(b).  The Trustee contends that the inventory had a value of $16,975.50.

Although Mr. Brazeal claims he had a security interest in the inventory by virtue of the Lease Agreement signed by the Debtors and under Oklahoma commercial law, no evidence of perfection was introduced or admitted, and Mr. Brazeal's counsel conceded that the claimed security interest was not perfected.[1]  Accordingly, even if a security interest in the inventory had been granted in favor of Mr. Brazeal or arose under operation of law, such a security interest would not defeat the Trustee's preference claim because it was admittedly

---

[1] A transfer to a creditor who possesses an unavoidable perfected security interest in property is not preferential because a fully secured creditor would not receive, by virtue of the transfer, more than it would receive in a chapter 7 liquidation.  See Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.), 990 F.2d 551, 554 (10th Cir. 1993).

unperfected.[2] Therefore, it is unnecessary to determine whether Mr. Brazeal in fact possessed a security interest in the inventory.[3]

As an affirmative defense, Mr. Brazeal asserts that pursuant to 11 U.S.C. § 547(c)(9), the transfer is not avoidable by the Trustee because the aggregate value of the repossessed inventory is less than $5,000.

## III. Findings of fact

On May 22, 2006, the Debtors and Mr. Brazeal entered into the Lease Agreement (Trustee's Exhibit 1) in which the Debtors agreed to lease business property for the purpose of operating a convenience store. In the Lease Agreement, the Debtors also agreed to purchase the existing inventory in the store, payable at the rate of $300 per month. The parties later stipulated to the value of the inventory purchased by the Debtors, and agreed that

---

[2]Pursuant to 11 U.S.C. § 544(a), the Trustee is empowered to assert the rights of a lien creditor under Oklahoma law, and under Oklahoma law, a lien creditor has superior rights in property as against a creditor that has an unperfected security interest in the property. See LMS Holding Co. v. Core-Mark Mid-Continent, Inc., 50 F.3d 1520, 1523 (10th Cir. 1995); 12A O.S. § 1-9-317(a)(2)(A) (lien creditor has priority over unperfected security interest). To the extent that Mr. Brazeal may have perfected by possession upon taking control of the inventory, because that event occurred within ninety days of the Debtors' bankruptcy filing, such perfection, which would have resulted in the improvement of Mr. Brazeal's position from unsecured to secured, would be avoidable to the same extent as the transfer of the property itself.

[3]Certain of Mr. Brazeal's other defenses were disposed of in the Order Denying Plaintiff's Motion for Summary Judgment and Order Denying Defendant's Cross-Motion for Summary Judgment (Adv. Doc. 19) ("Summary Judgment Order") entered on October 11, 2007. Specifically, the Court concluded that Mr. Brazeal's contention that he had retained title to the inventory pending full performance of the installment sale agreement by the Debtors, and therefore the inventory was not property of the Debtors at the time it was repossessed, lacked evidentiary and legal merit.

the Debtors would pay Mr. Brazeal a total of $16,842.55 for the inventory.[4]  Pre-trial Order at ¶ 3(b).  Title to the inventory passed to the Debtors at the time the Lease Agreement was executed.  Summary Judgment Order at 11.

The Debtors operated the convenience store for approximately seven months, during which time some of the original inventory was sold and some new inventory was purchased. The Debtors ceased doing business on December 28, 2006.  Pre-Trial Order, ¶ 3(c) and (d). On January 3, 2007, Mr. Brazeal took possession of the premises and the remaining inventory, and resumed operating the convenience store.  Id., ¶ 3(f).  The Debtors filed their petition under Chapter 7 of the Bankruptcy Code on January 19, 2007.

The Trustee contends that Mr. Brazeal's repossession of the inventory, which he contends had a value of $16,975.50, constituted a preferential transfer of property of the Debtors' estate. The parties stipulated that Mr. Brazeal repossessed the inventory within the ninety day period prior to the Debtors' bankruptcy; that the Debtors were insolvent or were rendered insolvent by the transfer of the inventory; and that the repossession of inventory constituted the transfer of property of the Debtors to a creditor for and on account of an antecedent debt.  Pre-Trial Order, ¶ 3(i), (j) and (k).  Mr. Brazeal disputes the value the Trustee places on the inventory, and submits that the value of the inventory is less than

---

[4] Mr. Brazeal performed an inventory the day before the Debtors took possession of the store.  He later calculated the price the Debtors were to pay for the inventory by multiplying the quantities of merchandise he recorded by the actual cost he paid for such merchandise, which amounts he obtained from invoices.

$5,000, which, if true, may constitute a complete defense to the Trustee's preference claim under 11 U.S.C. § 547(c)(9).

The Trustee, through the testimony of the Debtors, and Mr. Brazeal presented two irreconcilable depictions of the composition and value of the repossessed inventory. The Debtors testified that for approximately two and one-half days prior to closing the store (*e.g.*, December 26-28, 2006), the Debtors, their employees and family members performed an inventory of the stock remaining at the store, including gasoline, which Mr. Callahan later recorded on an Inventory Valuation Report. Trustee's Exhibit 2 ("Debtors' Inventory Report"). The inventory team determined the quantities of items listed on the report, and Mr. Callahan entered this data into a computer program that had contained the actual cost of the items when they were purchased. Because the inventory was performed during a two and one-half day period while the store was still open, some merchandise that appeared on the Debtors' Inventory Report was sold in the ordinary course of business. Mr. Callahan estimated the cost of the items sold was approximately $800. In addition, a small number of perishable items that appeared on the report, such as dairy products, were given to employees or others, or taken home by the Debtors. These items cost approximately $100. After deducting the value of the merchandise sold or given away, the Debtors valued the inventory, including gasoline, that they left at the store at closing at $18,769.56.

On January 11, 2007, after repossessing the inventory, Mr. Brazeal wrote a check in the amount of $5,711.46 to B&M Oil Company, which the parties agree constituted payment for $5,711.46 of the $6,785.48 of gasoline listed on the Debtors' Inventory Report. Pre-Trial

5

Order, ¶ 3(g), Defendant's Exhibit 5.  The Trustee concedes that Mr. Brazeal should be given credit for providing reasonably equivalent value for that portion of the gasoline inventory (*i.e.*, by reducing the Debtors' obligation to B&M Oil).  Accordingly, the Trustee contends that on a cost basis, the value of the inventory repossessed by Mr. Brazeal was $13,058.10. However, the Trustee argues that because Mr. Brazeal did or should have realized a profit upon selling the inventory, the value of the inventory should be augmented by thirty percent, resulting in a value of $16,975.50.

      Upon taking possession of the store on January 3, 2007, Mr. Brazeal and his wife and employees also took an inventory, which they recorded by hand on various yellow pads (the "handwritten inventory").  In connection with the inventory, the Brazeals first threw away some of the items because they were out of date, were donated by the Walmart Distribution Center, or were otherwise not merchantable, and they counted the remaining items.  After receiving a copy of the Debtors' Inventory Report at some point after this litigation began, the Brazeals adjusted the quantity and value of the items on a copy of the Debtors' Inventory Report, allegedly to conform to the handwritten inventory.  Brazeal Exhibit 3 (the "Adjusted Inventory Report").  On the Adjusted Inventory Report, the Brazeals reduced the quantity of various items because the merchandise was outdated (*e.g.*, deli meats, magazines, some canned goods), merchandise was not sellable (*e.g.*, items purchased from a dollar store or donated), or merchandise was held on consignment (*e.g.*, sunglasses).  However, the quantities of an extensive number of items listed on the Debtors' Inventory Report were reduced to zero without explanation.  For example, of all items listed in the "Deli" category,

the Brazeals contend the Debtors left marketable items valued at $276.76, while the Debtors valued the "Deli" inventory at $1,382.00. While it is obvious that meat, cheese and other perishables may have been justifiably discarded, the Brazeals also discounted to zero hundreds of dollars of non-perishables, such as bags, foil, plastic wrap, napkins, plastic ware, straws, styrofoam trays, etc., without explanation. Mrs. Callahan testified that the vast reductions in quantities could not be explained by the minimal sale of merchandise that occurred during the Debtors' inventory, or by outdating or spoilage.

In addition, the Brazeals significantly reduced the cost reported by the Debtors for candy, gum, canned goods, ice, and other items, by using cost figures obtained from a list from a different grocery supply firm than the one used by the Debtors. An extensive number of items were crossed out or reduced to zero. The Adjusted Inventory Report omitted the value of all the gasoline listed on the Debtors' Inventory Report ($6,785.48), not just the gasoline for which Mr. Brazeal paid B&M Oil ($5,711.46). According to Adjusted Inventory Report, the Brazeals set the value of the inventory, at cost, at $8,246.00. The handwritten inventory was never produced to the Trustee in this litigation, and was not available at trial. Because of the vast discrepancy between the Debtors' Inventory Report and the Adjusted Inventory Report, and the absence of the handwritten inventory in evidence, the Court is not convinced that Brazeal's Adjusted Inventory accurately reports the inventory actually repossessed by Mr. Brazeal. In addition, the fact that Mr. Brazeal valued the inventory he originally sold to the Debtors in excess of $16,000, a portion of which the Debtors sold but

then replenished during their tenure at the store, lends credence to the cost figures and level of inventory contained in the Debtors' Inventory Report.

Accordingly, the Court finds that the repossessed inventory had a cost of $13,058.10. The "value" of the inventory that the Trustee may be entitled to recover, however, depends upon what valuation method is appropriate under the circumstances, which is a legal conclusion.

**IV.    Conclusions of law**

    A.    Section 547(b)

Section 547 of the Bankruptcy Code provides, in relevant part:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made--

        (A) on or within 90 days before the date of the filing of the petition; or

        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5) that enables such creditor to receive more than such creditor would receive if--

      (A) the case were a case under chapter 7 of this title;

      (B) the transfer had not been made; and

      (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). The Trustee has the burden of proving all the elements of Section 547(b). See 11 U.S.C. § 547(g). The parties have stipulated to elements stated in subsections (b)(1) through (b)(4). With respect to the fifth element, the Trustee testified that except for the potential recovery from Mr. Brazeal, the estate possessed no non-exempt assets. If Mr. Brazeal had not repossessed the inventory, he would be entitled to only a *pro rata* distribution of the estate, which would consist solely of funds acquired upon liquidating the inventory, less administrative expenses. Because Mr. Brazeal did not prove that he had a perfected security interest in the inventory that would have entitled him to receive a distribution from this estate equal to the value of the inventory, Section 547(b)(5) has been established. Accordingly, the Trustee has satisfied his burden of proving all elements of Section 547(b). The transfer is avoidable, and the Trustee may recover the inventory or its value from Mr. Brazeal pursuant to 11 U.S.C. § 550,[5] unless Mr. Brazeal sustains his burden of proving an affirmative defense.

---

[5]Section 550(a) provides–

> [T]o the extent that a transfer is avoided under section 544, [and/or] . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer[.]

11 U.S.C. § 550(a).

9

B.  Section 547(c)(9)

Section 547(c) of the Bankruptcy Code contains affirmative defenses to a trustee's avoidance claim under Section 547(b). Mr. Brazeal invokes Section 547(c)(9), which, at the time of the transfer at issue, stated–

(c) The trustee may not avoid under this section a transfer--

*****

(9) if, in a case filed by a debtor whose debts are not primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $5,000.

11 U.S.C. § 547(c)(9) (2005). Mr. Brazeal has the "burden of proving the nonavoidability of a transfer under" Section 547(c)(9), which requires Mr. Brazeal to establish that (1) the Debtors' debts were not primarily consumer debts and (2) the aggregate value of the inventory was less than $5,000. See 11 U.S.C. § 547(g).

Mr. Brazeal did not introduce any evidence concerning the composition or nature of the Debtors' debts. The Court notes that in their Voluntary Petition, the Debtors indicated that "[d]ebts are primarily business debts." Main Case Doc. 1. On their schedules, the Debtors listed total debt of $423,178.72. Id. The Debtors' schedule of unsecured non-priority debt (Schedule F) included debts of $30,346.03 to B&M Oil, $14,742.55 to Mr. Brazeal for "convenience store inventory," $159,000.00 to Mr. Brazeal for the "[l]ease on business property," $1,987.00 to Mr. Brazeal for "utilities owed on business," and $1,165.31 to Mr. Brazeal for "property taxes," all of which might be classified as business debts. Other potential business debts appearing on Schedule F are $3,200.00 owed to Merimac Capital

Leasing for "check imaging & credit card equipment," $1,200.00 owed to the Oklahoma Corporation Commission for a "tank test and site assessment" for "possible gas tank leak contamination," $8,000.00 owed to Petroleum Marketing Systems for "pump repair & 2 gas pumps," $79.00 owed to Satelite Refuse Systems for "trash service at business property," and $550.00 owed to Solaray Corporation for "consignment stock." These debts total $220,269.89, which would constitute approximately 52% of the Debtors' total debt. While the Court may take judicial notice that the Debtors in fact made such statements in their petition and schedules, the Court may not accept such representations, which are hearsay, for their truth in this proceeding. Mr. Brazeal did not establish through examination of the Debtors or otherwise the ratio of consumer to non-consumer debt, and the Trustee did not have an opportunity to cross-examine the Debtors on the nature of their debts, or the accuracy of the amount or characterization of the debts represented in the schedules. Mr. Brazeal did not establish that the Debtors' debts were not primarily consumer debts, and therefore has not met his burden of proving the first element of his Section 547(c)(9) affirmative defense.

  C. Section 550(a)

Because the transfer of the inventory is avoidable pursuant to Section 547 of the Bankruptcy Code, and because the inventory has been sold or otherwise disposed of by Mr. Brazeal, the Trustee may recover from Mr. Brazeal, for the benefit of the estate, the value of the inventory pursuant to Section 550(a) of the Bankruptcy Code. Section 550(a) provides–

> [T]o the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred,

11

>or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer[.]

11 U.S.C. § 550(a). The value that the Trustee may recover requires the determination of an appropriate method of valuing the inventory considering the posture and circumstances of the case.

The Trustee favors appraising the inventory at a "going concern" value– that is, the amount the Trustee would have realized had the Trustee operated the convenience store and sold the inventory at retail in the ordinary course of the business. In support of this view, the Trustee cites Pokela v. Red Owl Stores, Inc. (In re Pokela), 107 B.R. 977 (Bankr. D. S.D. 1989). While it is true that in Pokela, the court determined that the Chapter 11 trustee was entitled to recover the "going concern" value (or retail value) of inventory that was repossessed by a creditor holding an unperfected security interest, it is significant that the "going concern" value was the only valuation presented, and the valuation was in fact propounded by the creditor itself. Id. at 993-94. The Court does not find the Pokela case analogous or persuasive.

The "essence of a preference is that it depletes the bankrupt's estate available to remaining creditors." Virginia Nat'l Bank v. Woodson (In re Decker), 329 F.2d 836, 839 (4th Cir. 1964). "The test is not what the creditor receives but what the bankrupt's estate has lost. It is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer." Id. at 840. The measure of depletion of the estate equals the amount a trustee could have realized upon selling the assets had they not been transferred out of the estate. If a trustee (or debtor in

12

possession) was in a position to feasibly sell inventory at retail in the ordinary course of a debtor's business, a "going concern" or retail value might fairly measure the estate's loss. However, if under the circumstances of the case, the inventory would have been sold at auction or at a bankruptcy sale, the loss to the estate is the liquidation value of the inventory. This principle is thoughtfully explained and illustrated in Active Wear, Inc. v. Parkdale Mills, Inc., 331 B.R. 669 (D. W.Va. 2005).

In the Active Wear case, when the debtor, whose business was weaving yarn into cloth, ceased operations, it transferred all unused yarn to its yarn vendor in order to reduce its debt to the vendor. Id. at 670. The vendor then resold the yarn for approximately $100,000.00 Id. The debtor then filed bankruptcy and the transfer to the vendor was determined to be an avoidable preference. Id. When the debtor in possession sought to recover the value of the yarn, the sole issue was whether the vendor was liable to the estate in the amount of $100,000.00– the amount the vendor obtained when it resold the yarn (*i.e.*, the value sold by a "going concern")– or $25,000.00– the amount the debtor would have realized if the yarn had not been removed from the estate (*i.e.*, liquidation value). The bankruptcy court held, and the district court affirmed, that the estate was depleted of the value the debtor in possession could have obtained at a liquidation sale. Id. at 672. This result was based in reality and in fairness. To give the debtor's estate "credit for the fair market value that could be realized by [the vendor] after the return of the yarn, would require giving [the debtor] the benefit of [the vendor's] expense in employing its expertise, time,

13

good will, and advertising to re-sell the yarn to another of its customers. Such a result is not supported by case law, statutory law, or common sense." Id. at 673.

In this case, the Trustee argued that if he had been able to take possession of the inventory upon the debtor's bankruptcy filing, he could have operated the convenience store for a period of time and realized the "going concern" or retail value of the inventory for the benefit of the estate. The Trustee did not establish the feasibility of operating the convenience store to liquidate the inventory, however. The petition was filed three weeks after the Debtors closed the store. The estate had no assets other than the inventory, and notably, lacked cash to permit the Trustee to pay the lease, utilities, salaries, taxes, insurance, and other overhead expenses related to operating a convenience store for the period of time necessary to sell all the inventory. Further, there was no evidence that liquidating the inventory in that fashion would have realized sufficient revenue to return a dividend to creditors after the operating expenses and the bankruptcy administrative expenses, such as the Trustee's commission, Trustee's attorney's fees, and other administrative costs, were paid. Rather, the Court concludes that to the extent the Trustee deemed the inventory worth administering at all, he would have offered it at auction or other bankruptcy sale, which would have yielded cash to the estate equal to the liquidation value of the inventory.

Thus, the Court concludes that, for the reasons stated in the Active Wear case, liquidation value is the appropriate measure of the loss to the estate from the preferential transfer of the inventory, and therefore is the amount the Trustee is entitled to recover under Section 550(a).

The only evidence of the liquidation value of the inventory at issue was provided by the testimony of Jay Litchfield, an auctioneer with experience in liquidating assets on behalf of bankruptcy estates. Mr. Litchfield opined that he would have expected to realize ten to twenty percent of the cost of the inventory at an auction. In support of his opinion, he testified that the composition of the inventory would not be particularly attractive or valuable to likely buyers at an auction because it consisted of single items or small quantities of merchandise rather than items in bulk. The Court finds Mr. Litchfield's testimony logical and credible.

Accordingly, the Court concludes that the loss to the estate resulting from the preferential transfer of inventory to Mr. Brazeal was $1,958.71, which is fifteen percent of the inventory's cost as estimated by Mr. Callahan ($13,058.10), and the Trustee may recover this amount from Mr. Brazeal for the benefit of the estate under Section 550(a).

**V.     Conclusion**

A judgment in the amount of $1,958.71 shall be entered against Mr. Brazeal and in favor of the Trustee.

**SO ORDERED** this 1st day of April, 2008.

DANA L. RASURE, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT